# In re Anonymous No. 26 D.B. 81

Disciplinary Board Docket no. 26. D.B. 81.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

KELLER, *Member,* January 9, 1990 — Pursuant to Pennsylvania Rule of Disciplinary Enforcement 218(c)(5), the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above-captioned petition for reinstatement.

## HISTORY OF PROCEEDINGS

This matter is before the Disciplinary Board on the petition of [petitioner] for reinstatement to the bar of the Supreme Court of Pennsylvania. By order dated December 14, 1982, the Supreme Court of Pennsylvania accepted the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania, dated January 20, 1982, and ordered that [petitioner] be disbarred from the practice of law within the Commonwealth of Pennsylvania.

In the prior proceedings which resulted in petitioner's disbarment, petitioner was found to have engaged in the following conduct: (1) delivering a bribe to a public official; (2) giving false testimony, under oath, to a federal grand jury after he had been granted immunity; (3) failing to make appropriate disclosure to a federal grand jury and law enforce-

ment officers; and (4) "laundering" checks for a public official.

Petitioner's conduct was found to have violated Disciplinary Rules 1-102(A)(3), which prohibited an attorney from engaging in conduct involving moral turpitude; 1-102(A)(4), which prohibited an attorney from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; 1-102(A)(5), which prohibited an attorney from engaging in conduct that is prejudicial to the administration of justice; 1-102(A)(6), which prohibited an attorney from engaging in any other conduct that adversely reflects on his fitness to practice law; 1-103(A), which required an attorney possessing unprivileged knowledge of a violation of D.R. 1-102 to report such knowledge to a tribunal or another authority empowered to investigate or act upon such violation; 7-102(A)(3), which prohibited an attorney, in the representation of a client, from concealing or failing to disclose that which he is required by law to reveal; and 7-102(A)(8), which prohibited an attorney, in the representation of a client, from knowingly engaging in other illegal conduct or conduct contrary to a Disciplinary Rule.

Petitioner filed the present petition for reinstatement to the bar of the Supreme Court of Pennsylvania on March 8, 1988, approximately five years and two months after the effective date of his disbarment. As of the date of this report, he has been disbarred for approximately seven years. The acts that led to his disbarment occurred more than 12 years ago.

The majority of the hearing committee concluded that petitioner did not meet his burden and recommended that the petition be denied. The board unanimously reverses and recommends reinstatement.

## FINDINGS OF FACT

(1) Petitioner is 39 years of age. He was born in [ ] in 1950. He came to the United States with his family in 1958. He became a naturalized citizen at 13 years of age when his father became a citizen.

(2) During petitioner's senior year of high school, he joined a fraternal organization called the Order of [A].

(3) At the Order of [A], petitioner met [B], who later became president of the order. [B], who was then an attorney, became petitioner's mentor and provided guidance and support to petitioner in his professional and personal life. [B] influenced petitioner to attend law school.

(4) While petitioner attended [C] College (and into law school), petitioner worked at the Order of [A]. He served as an administrative assistant to [B], maintained the organization's checkbook and membership roll, oversaw the restaurant and supervised the staff on behalf of [B].

(5) Petitioner received a Bachelor of Arts Degree from [C] College in 1972 and immediately thereafter entered [D] Law School.

(6) During law school, petitioner continued to work for [B] as a law clerk, with the exception of one summer when he served as an intern to the Office of the United States Attorney for the [ ] District of Pennsylvania.

(7) Upon graduation from law school in the summer of 1975, petitioner worked for [B] as an associate. Petitioner was employed by [B] as an associate (and later became his partner) from September 1975 through the early part of 1978.

(8) In or about September 1975, petitioner was hired by [E], the then executive director of the [F],

to serve as staff attorney to [F]. Petitioner was employed by [F] from September 1975 to September 1976.

(9) Petitioner was introduced to [E] by [B]. For a period of time, petitioner worked for both [B] and [F].

(10) Petitioner was admitted to the Bar of the Supreme Court of Pennsylvania on October 7, 1975.

(11) Petitioner was also admitted to the United States District Court for the [ ] District of Pennsylvania on May 18, 1978; the United States Court of Appeals for the [ ] Circuit in June 1978; the Supreme Court of [ ] on May 20, 1976, and the United States District Court of [ ] on April 27, 1976.

(12) Petitioner was disbarred from the practice of law in this Commonwealth by order of the Supreme Court of Pennsylvania dated December 14, 1982, as a result of certain acts that he committed in 1975, 1976 and 1977. He was disbarred from the courts identified in finding of fact (11) based on reciprocity.

(13) At the time petitioner committed the acts that led to disbarment he was newly admitted to the bar.

(14) In late 1975, petitioner "laundered" checks for [E] which totalled approximately $10,000. The checks were drawn on the accounts of various contractors with the names of the payees left blank. Petitioner cashed the checks and delivered the money to [E] in such a way as to leave no record of [E's] receipt of the money.*

(15) In connection with litigation involving [G] Industries Inc. and [F], petitioner delivered cash

---

* Except where otherwise indicated, findings of fact with respect to the acts that led to petitioner's disbarment are based on the opinion of the Supreme Court of Pennsylvania issued on December 14, 1982, a copy of which opinion is appended to petitioner's petition for reinstatement.

payments of $15,000 on March 30, 1976 and $12,500 on May 7, 1976 to [E] at the request of [B]. Petitioner knew that at least one cash delivery constituted payment of a bribe to a public official.

(16) When the [G] transaction became the subject of a federal grand jury investigation, petitioner was subpoenaed. He invoked his privilege against self-incrimination and was granted immunity by the United States District Court. At [B's] request, petitioner gave perjured testimony in which he denied knowledge of the fee-splitting arrangement between [B] and [E] and of the March 30 and May 7 deliveries of cash to [E].

(17) Petitioner later learned that the president of [G], [H], who had also given perjured testimony, had recanted his previous testimony and told the truth about the [G] transaction.

(18) Under threat of prosecution for perjury, petitioner then recanted his own perjured testimony and cooperated with the grand jury investigation and the federal government's subsequent prosecution of [E].

(19) In addition to making full disclosure of the [H] transactions to the federal grand jury, petitioner gave the FBI and United States Attorney's Office information which had heretofore been unsolicited by the federal authorities regarding certain acts that [E] had asked him to perform involving checks drawn by certain bidding contractors while petitioner was staff attorney to [F].

(20) After the events that led to disbarment, petitioner practiced law for approximately five years until his disbarment on December 14, 1982. During that period of time, petitioner was primarily a sole practitioner who did some work for the [I] and practiced criminal law for other clients.

(21) Petitioner has served on the Board of Directors of [J] since 1979. He presently serves as Chairman of the Board of Directors of [J] and has served in that capacity since January 1983.

(22) In 1983, immediately following his disbarment, petitioner worked as a law clerk to the [K] firm for approximately six months. He performed legal research and drafting in the areas of Pennsylvania securities law and real estate syndication, among other things.

(23) After his disbarment, petitioner devoted substantial time to a partnership he formed with [L] in 1981 called [M] Apartments.

(24) In January 1983, petitioner formed a second partnership called [N] Apartments through which an apartment complex and commercial building in [   ], among other properties, were purchased.

(25) In January 1983, petitioner and [L] formed a corporation known as [O] Enterprises Inc. to acquire, development and manage their real estate investments and holdings. Petitioner has been and continues to be president of [O] Enterprises Inc.

(26) Since June 1983, petitioner has served as the Chief Executive Officer of [P] Communications which sells cellular telephones and communication equipment.

(27) In 1985 petitioner attended the [Q] Executive MBA Program at the University of [R], [Q] School of Business and received his MBA degree from that institution in 1987.

(28) In December 1986, petitioner became a general partner of [S] Associates, a partnership formed with [L] to develop Pennsylvania properties.

(29) In February 1987, petitioner became a vice-president and secretary of [T] Inc., a corporation that publishes the [U] newsletter for [V] Associa-

tion. [V] is an organization which serves as a health care provider to [ ] police and firefighters.

(30) Petitioner and his father-in-law also acquired a business called [W] Company located in [ ].

(31) Since 1985, petitioner has volunteered and continues to volunteer his services to [X] Church and Monsignor [Y]. He maintains a close relationship with [X] Church and attends Mass there. He also has an affiliation with [Z] Roman Catholic Church in [ ]. Petitioner has volunteered his services as business consultant to the [AA] Association and to the [BB]. Petitioner has also provided non-legal services and business assistance to the public in the Constituency of the [ ] Ward in [ ], Pa., free of charge.

(32) Pursuant to section 89.275 of the Disciplinary Board Rules, petitioner filed a reinstatement questionnaire with his petition for reinstatement.

(33) Pursuant to the request of the Office of Disciplinary Counsel, petitioner provided federal, state and local income tax returns for the period of his disbarment.

(34) A comparison of the income tax returns provided by petitioner with his reinstatement questionnaire reveals the following:

(a) At paragraphs 11 and 12 of the reinstatement questionnaire, petitioner did not include at least three partnerships that are included in his personal tax returns: [Petitioner] & [CC], [DD] & Associates and [EE].

(b) Petitioner did not include, at paragraphs 11 or 12 of the reinstatement questionnaire, several other sources of income for the year 1985, such as [FF] Factory Products, [GG] Restaurant and [HH].

(c) Petitioner stated in his reinstatement questionnaire, at paragraph 11, that his 1983 income from the law firm of [K] was $10,000 rather than the $17,600

reported in his return for that year, and that his 1984 income from that law firm was $15,000, while he has no reported wages from [K] on his return for 1984.

(d) After petitioner provided his income tax returns, he amended his reinstatement questionnaire to disclose $10,000 in income from [II], Esq., in 1986 for "business consulting," income that was revealed by his income tax return; and

(e) While the reinstatement questionnaire indicates that until 1987 petitioner owned 40 percent of the shares of [P] Communications Corporation from June 1983 until January 1987, income tax returns for that corporation and its predecessors show that 100 percent of the shares were reported to the State of [  ] as owned by [JJ].

(35) In a resume attached to petitioner's application to the [Q] School which petitioner prepared in late 1983 or early 1984, he stated that he sold his law practice in September 1982.

(36) The evidence supports the following findings with respect to petitioner's driver licenses in Pennsylvania and [  ]:

(a) On or about November 4, 1985 petitioner applied for a [  ] photo automobile license;

(b) On his application for a [  ] driver license, in response to a question as to whether or not he held a driver license in any other state, petitioner marked "no";

(c) At the time petitioner signed the [  ] application for a driver license, he was a licensed driver in Pennsylvania;

(d) Records of the Commonwealth of Pennsylvania, Bureau of Motor Vehicles, indicate that petitioner renewed his Pennsylvania driver license on numerous occasions after he obtained a [  ] license and;

(e) It was only after the Office of Disciplinary Counsel brought to the attention of petitioner's attorney that petitioner was illegally holding licenses in both states, that [petitioner] handed in his Pennsylvania driver license.

(37) Petitioner was counsel to [V] from the time that [B] was disbarred (July 1978) until petitioner was disbarred in December 1982.

(38) After petitioner's disbarment, [KK] Esq., of [K] became counsel to [V].

(39) During the period from 1983 to January 1986, [II], Esq., was an associate with the firm of [K] and handled the representation of [V].

(40) In January 1986, [II] left the [K] law firm and established his own firm.

(41) On January 1, 1986, [KK] & [II], Attorneys-at-Law, entered into an agreement with [LL] Enterprises Inc. (the parent corporation for [V]), which provides that for $30,000 per month, [KK] & [II] would provide to [LL] "professional legal and consulting services."

(42) The evidence supports the following findings with respect to the [KK] & [II] agreement:

(a) There is no law firm by the name of [KK] & [II].

(b) The "[KK]" in [KK] & [II] is [KK], Esq., and the "[II]" is [II], Esq.

(c) The monthly rate for the agreement was based in part on the amount of fees previously paid by [V] to its counsel prior to the January 1, 1986 agreement.

(d) [KK] presently receives $5,000 a month as a result of the January 1, 1986 agreement.

(e) All business consulting services provided under the [KK] & [II]-[LL] agreement, other than actuarial consultation, is performed by [O] Business Advisory Systems; and

(f) [MM], chairman of the board of [V], is unaware how the $30,000 monthly fee paid to [II] is divided.

(43) In December 1986, [O] Business Advisory Systems, a division of [O] Enterprises Inc., entered into a business consultant and management agreement with [II] Law Offices.

(44) Under the terms of the agreement, petitioner, [L] and the staff of [O] have provided and continue to provide business consulting services and other non-legal services to [V]. In addition, [O] provided and still provides non-legal business related services to [II's] other individual and corporate clients.

(45) Under the terms of the agreement, [O] receives as compensation a monthly fee of $16,000 for 160 hours of work performed per month.

(46) [V] is a multimillion-dollar operation with over 12,000 members whose families use the [V] health care facilities (approximately 40,000 individuals). The type of work [O] performs for [V] under the agreement is of a non-legal, business-related nature such as assistance with financing packages, investment consulting, real estate development, advice on corporate strategy and acquisition of businesses, membership drives, labor issues, delivery of benefits to members and assistance with their computer system. Petitioner also helps to oversee [V's] day-to-day operations.

(47) Petitioner spends approximately 50 percent of his time doing business consulting under the agreement and spends the remaining time between real estate, construction projects and the [NN] store, which is owned by [O].

(48) When [II] bills his clients for legal and consulting services, he does not separately bill for each type of service.

(49) At the reinstatement hearing, petitioner produced 11 character witnesses, all of whom attested

to petitioner's present moral qualifications and excellent reputation in the community.

(50) The persons who testified were Monsignor [Y]; [OO], Ph.D.; [PP]; [QQ]; [RR], Esq.; [SS]; [TT]; [MM]; [UU]; [II], Esq.; and [L].

(51) The character witnesses, including two attorneys, a priest, a professor at the University of [R], [Q] School of Business and seven businesspersons, are men of stature who testified to petitioner's abilities, integrity and competence. They all hold petitioner in very high respect, despite his disbarment.

(52) All of the character witnesses testified that petitioner has demonstrated remorse and regret for his prior'conduct, that if petitioner were reinstated, they would utilize his services as an attorney or refer legal matters to him, and that in their opinion petitioner's reinstatement would not be detrimental to the integrity and standing of the bar or subversive to the public interest.

(53) Petitioner has shown sincere remorse for his conduct that led to disbarment and regrets his misdeeds.

(54) Petitioner acknowledges that he committed egregious errors in judgment and conduct. He testified that he has learned from his mistakes and will never again commit the errors that have blighted his personal life and career, and that have caused both he and his family shame and humiliation.

(55) Petitioner has testified that if readmitted to the practice of law, he would not engage in unethical conduct of any type in the future.

(56) Since January 1983, over the past six years, petitioner has kept abreast of emerging legal issues in the law and has familiarized himself with the changes in the law, recent statutes and case law.

(57) Petitioner has subscribed to and read the Pennsylvania Reporter and numerous other publications, periodicals and advance sheets.

(58) Petitioner has read and continues to read opinions of the Supreme Court of Pennsylvania and lower courts. He has diligently read the *Pennsylvania District & County Reports, [ ] County Reports, The Legal Intelligencer,* slip opinions, Pennsylvania Bar Institute publications, law texts and law review articles.

(59) In 1985, while enrolled in the [Q] program, petitioner attended two law-related courses.

(60) Petitioner has purchased and reviewed the [ ] Court of Common Pleas Civil Practice Manual, (5th ed. 1987). He has also purchased and used various audio cassettes and manuals sponsored by the [ ] Institute of Continuing Legal Education and the [ ] Trial Lawyers Association pertaining to negligence, labor matters, real estate and collection practice.

(61) Petitioner has also purchased and studied the following textbooks: *Effective Drafting of Contracts,* Gann Law Books, and *Acquisition and Corporate Development,* Lexington Books.

(62) In addition to the above-described continuing legal education, petitioner has satisfied the requirements of section 89.279 of the Disciplinary Board Rules and Procedures.

(63) All of the character witnesses who testified on petitioner's behalf at the reinstatement hearing affirmed petitioner's competence, intellect and abilities.

## DISCUSSION

The board is acutely cognizant that before rule 218(c)(3) of the Rules of Disciplinary Enforcement —

"(i) A disbarred or suspended attorney shall have the burden of demonstrating by clear and convincing evidence that such person has the moral qualifications, competency and learning in law required for admission to practice law in this Commonwealth and that the resumption of the practice of law within the Commonwealth by such person will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest."

— is to be addressed the threshold question as enunciated in *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986) must be explored and answered.

As the court explained in *Keller, supra:*

"In the case of disbarment there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time. When reinstatement is sought by the disbarred attorney, the threshold question must be whether the magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon 'the integrity and standing of the bar or the administration of justice nor subversive of the public interest.' Pa.R.D.E. 218(c)(3)(i)."

The board in concluding that petitioner's reinstatement *should be granted* inherently finds that the crimes and circumstances under which petitioner was originally disbarred, even though egregious, would permit petitioner resumption of practice without a detrimental effect upon the integrity and standing of the bar or the administration of justice nor subversive of the public interest. Realizing that there is no quantitative length of time for a disbarred lawyer to overcome the *Keller* litmus threshold, there must be a combination of quantita-

tive length of time coupled with a qualitative period of rehabilitation in order for a disbarred attorney to be reinstated.

It has been approximately 12 years since the acts upon which petitioner was disbarred were committed. It is important to note that at the time the petitioner was approximately 25 years of age and through misguided loyalty and in violation of his oath as a lawyer wrongfully acted at the bequest of his mentors, Messrs. [B] and [E]. Since that time the conduct and rehabilitative efforts of petitioner since his disbarment have been impressive. He has obtained an MBA from the [Q] School. He has been chairman of the board (a position of trust) of the [J], a Pennsylvania bank, and has carried out his duties admirably. He has devoted a substantial amount of time to charity and volunteer work. He has achieved substantial success in his various business ventures. Finally, and perhaps most importantly, he has expressed and shown sincere regret and remorse for the conduct which led to his disbarment.

There are certainly offenses that an attorney can commit that are of such "magnitude of the breach of trust" that a rehabilitative life comparable to that of Mother Theresa would not entitle a disbarred attorney to be readmitted under the principles of *Keller, supra*. However, given the petitioner's qualitative rehabilitation, the public trust has been restored.

The hearing committee denied petitioner's reinstatement with one member dissenting that the length of time since petitioner's disbarment was insufficient to overcome the egregious magnitude of his offenses. The board unanimously believes that the length of time of disbarment in this case, approximately seven years, is but one-half of the formula for reinstatement; the other half of the formula for

reinstatement has to be the qualitative rehabilitation that a disbarred attorney undergoes during his absence. It would be ludicrous to suggest that a disbarred lawyer similarly situated as the petitioner, but who goes 10 years before requesting reinstatement and does nothing insofar as his becoming a productive member of society should be granted greater consideration by the mere passage of time. Rather the test be coupled not only with the passage of time but with one's rehabilitative efforts as time passes.

It is abundantly clear that petitioner's quality of effort in righting himself and becoming a productive citizen both in the community, in the church and in the business world tips the scales convincingly in his favor for reinstatement.

## CONCLUSION

Based on the foregoing, the Disciplinary Board unanimously concludes that petitioner, [   ], be reinstated to the bar. Costs are to be paid by petitioner.

## ORDER

May 23, 1990 — The report and recommendations of the Disciplinary Board dated January 9, 1990, are accepted, and the petition for reinstatement is granted. Pursuant to rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the board in the investigation and processing of the petition for reinstatement.

Mr. Justice McDermott did not participate in the consideration or decision of this case.